733 A.2d 1159

STATE OF NEW JERSEY, TOWNSHIP OF PENNSAUKEN, PLAIN-TIFF–APPELLANT AND CROSS–RESPONDENT, v. JAMES SCHAD, DEFENDANT–RESPONDENT AND CROSS APPELLANT.

Argued March 1, 1999—Decided July 28, 1999.

162

163

164

*Michael E. Joyce,* argued the cause for appellant and cross-respondent (*Kelley, Wardell & Craig,* attorneys).

*Bradley J. Shafer,* a member of the Michigan and Arizona bars, and *John A. Underwood,* argued the cause for respondent and

cross-appellant (*Underwood & Micklin*, attorneys; *Robert E. Levy*, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a municipality applied the restrictive provisions of its sign ordinance against interior store displays that were visible from the exterior of the premises. The owner of the building premises contended that the ordinance did not apply to interior displays and that the enforcement of the ordinance was unconstitutional primarily because it violated rights of free speech protected by the First Amendment. The appeal thus raises the initial issue of the interpretation of the municipal ordinance and whether its provisions apply to signs that are not physically located outside or affixed to the exterior of a commercial property. If the ordinance embraces such displays, that issue in turn gives rise to constitutional defenses involving essentially the reasonableness of restrictions on commercial speech.

## I

Defendant, James Schad, operates two adult entertainment establishments in the Township of Pennsauken, one on Admiral Wilson Boulevard and the other on Route 73. Both locations have illuminated, free-standing signs and at least one building-mounted sign, all of which either conform to the requirements of the Township's sign ordinance, *Pennsauken Code* § 126-711 (*Code*), or were permitted as non-conforming uses under the ordinance. *Code* § 126-711(C)(7).

In September 1995, without securing a requisite permit, defendant erected eight displays at the Route 73 store and twelve displays at the Admiral Wilson Boulevard store. Each display consisted of a color transparency measuring 42.75 square feet, depicting a woman dressed in swimwear, and was set in an individual wooden encasement with a backlit panel and a glass front. The displays were placed twelve to twenty-four inches

behind the stores' front windows, but were not attached directly to the windows. The transparencies were visible only from outside the buildings and were illuminated at night.

Defendant was issued summonses in connection with the transparency displays for various violations of the Township's sign ordinance. Those violations included the failure to remove signs exceeding the maximum number permitted and the maximum gross square footage allowed at a given location, *Code* § 126–711(C)(2), and failure to obtain permits for the transparency displays, *id.* at § 126–711(G)(1) and (2).

On March 21, 1996, defendant was found guilty by the Pennsauken Municipal Court and was fined $30,000, together with costs of $120. The court held that the ordinance applied to defendant's transparencies even though they were located within his stores, and rejected defendant's constitutional defenses. On September 3, 1996, following a trial *de novo* in the Law Division, defendant's convictions were affirmed.

On June 28, 1996, summonses were once again issued to defendant, charging continuing violations of the same sign ordinance provisions. On September 25, 1996, defendant was again found guilty by the municipal court and fined $102,000. On appeal to the Law Division, and following a trial *de novo,* defendant's convictions were affirmed, but the fine was reduced to $65,920.

On February 5, 1997, defendant appealed to the Appellate Division for a review of the lower court proceedings. The Appellate Division, addressing both appeals in one opinion, reversed all of defendant's convictions. 307 *N.J.Super.* 493, 704 *A.*2d 1337 (1998). The court determined that the transparency displays placed inside the windows of each adult entertainment premises were not "signs" within the meaning of the Township's sign ordinance. *Id.* at 500, 704 A.2d 1337. The Appellate Division vacated the fines. *Ibid.*

The Township petitioned for certification to review the Appellate Division's interpretation of the ordinance. Defendant filed a

Notice of Cross–Petition for Certification to review the constitutional issues not addressed by the Appellate Division. This Court granted both petitions. *156 N.J.* 382, *718 A.2d* 1210 1211 (1998).

## II

The sign ordinance is part of Chapter 126 of the Township of Pennsauken Code, entitled "Development Regulations." The purposes of the regulations are set out in the ordinance, and include the promotion of "public health, safety, convenience, morals and general welfare[,]" *Code* at § 126–101(A); the "preservation of the most healthful and otherwise beneficial environment[,]" *id.* at § 126–101(E); the encouragement of "compatibility in the visual environment[,]" *id.* at § 126–101(I); and the promotion of "free flow of traffic" and reduction of traffic "congestion and blight[,]" *id.* at § 126–101(H). The ordinance expressly provides that the development regulations should be interpreted to hold provisions to "the minimum requirements for achieving the goals and purposes" of Chapter 126. *Id.* at § 126–100(B).

Section 126–700.1 of the ordinance defines a sign as:

A structure and a land use, a building wall or other outdoor surface or any device used for visual communication, display, identification or publicity and more fully described under § 126–711 of this chapter.

Section 126–711(A) elaborates on that definition:

A sign shall include banners, streamers, whirling or lighting devices or any other type of attention-attracting device and may be a single-faced, double-faced or a V-type structure.

Section 126–711(A) of the ordinance also describes several types of signs in respect of applicable regulations. For example:

(1) Business sign. A sign which directs attention to a business or commodity for sale, or a profession, service or entertainment rendered or offered upon the premises where such sign is located.

. . . .

(7) Illuminated Sign. Any sign which is designed to be seen at night by virtue of artificial light from within, behind or upon such sign, but not including reflector-type signs unless the source of light is made a part of, or is related to, such sign.

. . . .

(9) Wall sign. A sign attached to or painted on a wall and subject to all sign regulations herein.

The ordinance requires a permit for certain types of signs, including non-residential signs exceeding twelve square feet and any illuminated sign, regardless of size. *Id.* at § 126–711(G)(1). Applicants must submit, as part of the permit application, "a sketch showing the size, location, text and owner [of the sign] . . . indicated in writing, together with a fee." *Id.* at § 126–711(G)(2). The required fee differs based on the square footage of the sign for which a permit is sought. *Ibid.* A sign measuring 8 to 25 square feet requires a $40 fee; a sign containing 25 to 100 square feet requires a $100 fee; and a sign covering more than 100 square feet requires a $150 fee. *Code* § 120–12(G) (amending § 126–711(G)(2)).

In order to receive a permit, an applicant must conform to the ordinance's various restrictions on the sign size, number, location and type. The relevant regulations in this case govern business signs in commercial districts:

C. Signs in commercial districts. The following signs may be erected and maintained in commercial districts, subject to the conditions specified:

. . . .

(2) Business signs or signs for any permitted commercial activity. A sign may be erected and maintained on the same building or premises as the use to which it refers, provided that:

(a) The number of such signs shall not exceed two (2) in C–1 Commercial Districts and four (4) in C–2 Commercial Districts.

(b) The maximum total area of all permitted signs shall not exceed an area equal to two (2) square feet for every one (1) lineal foot of building frontage; and signs shall be permitted on a building wall or roof; provided, however, that no sign shall extend higher above the building height, as defined herein, than four (4) feet.

(c) Temporary window signs shall not be considered in computing the allowable sign area, provided that such interior window signs do not cover more than ten percent(10%) of any single window and are not permanently affixed to the window.

[*Id.* at § 126–711(C).]

III

A.

The established rules of statutory construction govern the interpretation of a municipal ordinance. *AMN, Inc. v. Township of S. Brunswick Rent Leveling Bd.*, 93 *N.J.* 518, 524–25, 461 *A.*2d 1138 (1983) *(citing Camarco v. City of Orange, 61 N.J. 463, 466, 295 A.2d 353 (1972))*; Norman J. Singer, *Sutherland Statutory Construction* § 30.06 (5th ed.1992). Those principles require that an ordinance should be interpreted to " 'effectuate the legislative intent in light of the language used and the objects sought to be achieved.' " *Merin v. Maglaki*, 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992) (citation omitted). *See also State Dep't of Law & Public Safety v. Gonzalez*, 142 *N.J.* 618, 627, 667 *A.*2d 684 (1995). The first step of statutory construction requires an examination of the language of the ordinance. *Bergen Comm'l Bank v. Sisler*, 157 *N.J.* 188, 202, 723 *A.*2d 944 (1999). The meaning derived from that language controls if it is clear and unambiguous. *Ibid.* If the text, however, is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent. *Wingate v. Estate of Ryan*, 149 *N.J.* 227, 236, 693 *A.*2d 457 (1997); *Lesniak v. Budzash*, 133 *N.J.* 1, 8, 626 *A.*2d 1073 (1993). Above all, the Court must seek to effectuate the "fundamental purpose for which the legislation was enacted." *New Jersey Builders, Owners and Managers Ass'n v. Blair*, 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972). Thus, for example, where a statute or ordinance does not expressly address a specific situation, the court will interpret it "consonant with the probable intent of the draftsman 'had he anticipated the matter at hand.' " *AMN, Inc.*, *supra*, 93 *N.J.* at 525, 461 *A.*2d 1138 (citations omitted). In that regard, "[i]t is axiomatic that a statute will not be construed to lead to absurd results." *State v. Provenzano*, 34 *N.J.* 318, 322, 169 *A.*2d 135 (1961).

Zoning ordinances generally are liberally construed in favor of the municipality. *Place v. Board of Adjust. of Saddle River*, 42 *N.J.* 324, 328, 200 *A.*2d 601 (1964). As the Appellate Division here recognized, however, the wording in such ordinances must be " 'clear and unambiguous so that [persons] of ordinary intellect need not guess at [its] meaning.' " 307 *N.J.Super.* at 499, 704 *A.*2d 1337 (quoting *Town of Kearny v. Modern Transp. Co.*, 116 *N.J.Super.* 526, 529, 283 *A.*2d 119 (App.Div.1971)). Because municipal court proceedings to prosecute violations of ordinances are essentially criminal in nature, *State v. Barnes*, 168 *N.J.Super.* 311, 314, 403 *A.*2d 7 (App.Div.1979), *rev'd on other grounds*, 84 *N.J.* 362, 420 *A.*2d 303 (1980), the Court should follow the rule of strict construction, interpreting the terms of the ordinance narrowly. The Court should also be guided by the rule of lenity, resolving any ambiguities in the ordinance in favor of a defendant charged with a violation thereof, *United States v. Shabani*, 513 *U.S.* 10, 17, 115 *S.Ct.* 382, 386, 130 *L.Ed.*2d 225, 231 (1994). *But see State v. McCague*, 314 *N.J.Super.* 254, 266, 714 *A.*2d 937 (App.Div.) (finding rule of lenity inapplicable because statute was unambiguous), *certif. denied*, 157 *N.J.* 542, 724 *A.*2d 802 (1998).

### B.

The Appellate Division addressed the issue of "whether the Township's sign ordinance reaches inside the business premises to control interior store displays which are placed behind front windows." 307 *N.J.Super.* at 498, 704 *A.*2d 1337. Invoking basic rules of statutory construction, the court rejected the Township's argument that defendant's transparency displays fell within the meaning of "display" in the definition of "sign" under section 126–700.1 of the ordinance. *Ibid.*

The plain language of the ordinance is unambiguous and indicates that the drafters intended to include interior signs that are constructed and designed to be viewed from outside the premises. Section § 126–700.1 provides a broad catch-all definition of "sign" as "any device used for visual communication, display, identifica-

tion or publicity and more fully described under § 126–711 of this chapter." The term "any" in that phrase indicates an intent to provide broad coverage. The formulation "used for" suggests that the identification of a device as a "sign" depends on its purpose. Defendant's transparencies plainly are devices used for visual communication, display, identification and publicity. The transparencies had the obvious purpose of communicating a message and generating publicity by identifying and depicting the type of entertainment provided by the premises. Joseph Patrlja, the manager of defendant's stores, testified that the transparencies were intended as "window display for people to know that we have beautiful girls . . . inside," and were directed at "anybody that passes by the building [and] the general public."

The Appellate Division reasoned that "[t]he word 'display' cannot be reviewed in a vacuum. On the contrary, its meaning must be assessed in light of the other words in the ordinance of which it is a part." 307 *N.J.Super.* at 498, 704 *A.*2d 1337 (citations omitted). According to the appellate court, all the words of section 126–700.1 clearly address exterior signage, and the statutory construction canon *noscitur a sociis* (the meaning of a word may be controlled by the words which surround it) precluded the Township from considering defendant's interior displays as covered by the definition of "sign" in that section. *Ibid.* The court relied on references to "building wall[s] or other outdoor surface[s], . . ." to signs "painted on a wall" and to "signs that may be erected on [a] building . . . ." in sections 126–700.1 and 126–711(A)(1),(9), to determine that "the express wording of the ordinance contemplates only the regulation of exterior signage." *Id.* at 498–99, 704 *A.*2d 1337. Thus, the Appellate Division held that the term "outside" in the more specific phrase "building wall[s] or other outdoor surface" in section 126–700.1, modified the subsequent general provision "any device used for visual communication, display, identification or publicity" in that section.

The Appellate Division's conclusion would allow a display attached to the external face of a window to qualify as a sign,

while excluding the exact same display if mounted on the internal side of the window. Statutory canons are suggestive tools that should not lead to an interpretation that contradicts a common sense understanding of the statutory language. *See New Jersey Builders, Owners and Managers Ass'n, supra,* 60 *N.J.* at 339, 288 *A*.2d 855 (noting that statutory interpretation should turn "on the breadth of the objectives of the legislation and the common sense of the situation") (citation omitted).

The qualifying term "outside" is undoubtedly the key element of the definition of "sign" under section 126–700.1. The term may be invested with a meaning that serves the purpose and effectuates the basic intent of the ordinance by applying to all signs the requirement that the display be observable from outside a building by the passing public. To limit that term so that the ordinance would apply only to signs or displays that are placed or located physically outside a building allows a proprietor to circumvent the ordinance's restrictions and intended effect by placing an otherwise noncomplying sign behind a window inside of the premises, while still communicating to passersby. Such an application would undermine the ordinance's objectives concerning the visual effect and environmental impact on the community. An interpretation of the term "outside" that focuses on the external visibility of the sign better harmonizes the language of the ordinance with the drafters' intent. Under that view, defendant's displays qualify as signs because their message was directed solely outside the buildings.

The ordinance further states that a sign "shall include banners, streamers, whirling or lighting devices or any other type of attention-attracting device and may be single-faced, double-faced or a V-type structure." *Code* § 126–711(A). This description is silent with regard to location. Like section 126–700.1, this section uses the term "any," implying the intent to create a broad classification of signs. Defendant's transparencies function with the effect and efficacy of a conventional sign, and by his design,

they are devices that readily attract public attention. They are covered by section 126–711(A).

Another subsection of the ordinance states that "[t]emporary window signs shall not be considered in computing the allowable sign area, provided that such interior window signs do not cover more than ten percent (10%) of any single window and are not permanently affixed to the windows." *Code* § 126–711(C)(2)(c). The Appellate Division concluded that the exemption provision for temporary window signs indicated that the ordinance applies only to interior signs that are affixed to the window because the treatment of signs not affixed to windows could have been, but was not, expressly mentioned. 307 *N.J.Super.* at 499, 704 *A.*2d 1337. Because defendant's transparency displays were not affixed to the windows of his establishments, the appellate court concluded that they fell completely outside the language of section 126–711(C)(2)(c). *Id.* at 499–500, 704 *A.*2d 1337 ("Simply stated, the subject of interior window displays is not covered by the existing sign ordinance.").

The fact that the ordinance exempts one category of interior signage from the regulation suggests that the ordinance generally covers interior signage. If the ordinance applied only to exterior signage, then temporary interior signs would already fall outside the scope of the regulation, and the exemption in section 711(C)(2)(c) would be unnecessary. *See, e.g., Bergen Comm'l Bank, supra,* 157 *N.J.* at 204, 723 *A.*2d 944 (noting that courts should avoid construction of statute that would render any word inoperative, superfluous, redundant, or meaningless).

### C.

■ We conclude that the language of the ordinance defining signs that are subject to its regulatory standards and restrictions includes and applies to interior illuminated transparency displays that are intended to be visible from outside the premises.

## IV

Defendant contends that the ordinance cannot be validly enforced against him. He maintains primarily that the ordinance is a content-based restriction of his fundamental right of free speech, a prior restraint on speech, and void for vagueness. Because the Appellate Division held that defendant's displays did not fall within the definition of sign under the ordinance, it did not address defendant's constitutional objections to the ordinance. Although these constitutional issues were not addressed, we find the constitutional arguments raised by defendant are unpersuasive and that the record, including the arguments of the parties, is adequate to enable us to dispose of the issues on appeal, obviating a further remand. *See R.* 2:10–5.

### A.

Defendant asserts that the ordinance violates his constitutional right of free speech. Both the federal and New Jersey constitutions provide protections from governmental interference with the speech of its citizens. *U.S. Const.* amend. I ("Congress shall make no law ... abridging the freedom of speech...."); *N.J. Const.* art. I, ¶ 6. ("Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press."). When a law or ordinance directly impinges on the constitutionally protected right of free speech, the State is required to justify the restriction. *Bell v. Stafford Township*, 110 *N.J.* 384, 395, 541 *A.2d* 692 (1988). Commercial speech, however, is granted less protection than other constitutionally-guaranteed expression. *Barry v. Arrow Pontiac, Inc.*, 100 *N.J.* 57, 72, 494 *A.2d* 804 (1985). Additionally, restrictions that are content-neutral are subject to less scrutiny than those that are content-based. *Ward v. Rock Against Racism*, 491 *U.S.* 781, 791–94, 109 *S.Ct.* 2746, 2753–55, 105 *L.Ed.2d* 661, 675–77 (1989). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an inciden-

tal effect on some speakers or messages but not others." *Id.* at 791, 109 *S.Ct.* at 2754, 105 *L.Ed.*2d 661.

■■■■■■■ Because our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment, federal constitutional principles guide the Court's analysis. *Hamilton Amusement Center v. Verniero*, 156 *N.J.* 254, 264–65, 716 *A.*2d 1137 (1998). The Supreme Court recently reaffirmed the four-part test to resolve First Amendment challenges to commercial speech that was first pronounced in *Central Hudson Gas & Electric Corp. v. New York Public Service Commission.*, 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.*2d 341 (1980). *See Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, ⸻ U.S. ⸻, ⸻, 119 *S.Ct.* 1923, 1930, 144 *L.Ed.*2d 161 (1999). In order for a restriction on commercial speech to survive First Amendment scrutiny:

> [I]t at least must concern lawful activity and not be misleading. [2] Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is no more extensive than is necessary to serve that interest.
>
> [*Central Hudson*, 447 *U.S.* at 566, 100 *S.Ct.* at 2350, 65 *L.Ed.*2d at 351.]

In addition, the Supreme Court further explained in *Clark v. Community for Creative Non-Violence*, 468 *U.S.* 288, 293, 104 *S.Ct.* 3065, 3069, 82 *L.Ed.*2d 221, 227 (1984), where time, place, and manner restrictions are placed on speech, those restrictions are valid only if its can be shown that they "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." The *Central Hudson* and *Clark* standards are often "closely intertwined," and the two analyses must be undertaken simultaneously. *City of Renton v. Playtime Theatres, Inc.*, 475 *U.S.* 41, 46, 54–55, 106 *S.Ct.* 925, 928, 932, 89 *L.Ed.*2d 29, 37, 42 (1986); *Hamilton Amusement Center, supra*, 156 *N.J.* at 268, 716 *A.*2d 1137.

■ The ordinance here clearly involves commercial speech.[1] In addition, the ordinance is content-neutral in its application to commercial communications. Although the ordinance requires that sign text be submitted to the Township as part of a permit application, the ordinance's plain language does not require or allow an official to use sign content as a basis for denying a permit. The text is used only to measure the size of irregularly-shaped signs and is necessary to determine whether the sign contains an "on-site" or "off-site" message, the latter of which is prohibited. *Code* § 126–711(C)(2). Township officials testified that they have never denied a sign application based on content. Defendant has not produced any evidence that the text requirement is a content-based method of determining whether to grant a permit. Consequently, the intermediate scrutiny applicable to commercial speech governs the disposition of this case rather than the heightened standard of strict scrutiny demanded by a content-based regulation, or a regulation proscribing political speech.

The first prong of the *Central Hudson* test, whether the speech concerns lawful activity and is not misleading, is readily met. Defendant's businesses were lawful and his displays reflective of the nature of those businesses.

■ The second *Central Hudson* factor, whether a substantial governmental interest is advanced by regulating the commercial speech, may be analyzed in conjunction with the first factor of the time, place, and manner test: whether the regulation is justifiable without reference to content. *Hamilton Amusement Center, supra*, 156 *N.J.* at 269, 716 *A.*2d 1137. Those factors are also

---

[1] Defendant concedes that, as applied to him, the ordinance regulates commercial speech, but argues that because the law potentially affects political speech, strict scrutiny should be invoked. In *Hamilton Amusement Center, supra*, 156 *N.J.* at 266, 716 *A.*2d 1137, we rejected the plaintiffs' suggestion that, because the ordinance at issue could potentially impede a noncommercial message, strict scrutiny ought to be applied even though on the facts of the case the speech involved was clearly commercial. Here, as there, the Court "decline[s] to discuss political speech in a hypothetical case that is not before [it]." *Ibid.*

satisfied. Interests in traffic safety and visual appearance are included as general objectives of the Development Regulations. *Code* § 126–101. It is well-settled that these are substantial governmental interests. *See Metromedia, Inc. v. City of San Diego*, 453 *U.S.* 490, 507–08, 101 *S.Ct.* 2882, 2892, 69 *L.Ed.*2d 800, 815 (1981) (noting that there is no "substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial government goals"); *Hamilton Amusement Center, supra,* 156 *N.J.* at 272, 716 *A.*2d 1137 (recognizing reduction of traffic hazards in connection with sexually oriented business as substantial governmental interest); *Bell, supra,* 110 *N.J.* at 393, 541 *A.*2d 692 (observing that preservation of aesthetics is legitimate goal of zoning ordinance); *Singer Supermarkets, Inc. v. Hillsdale Bd. of Adjust.,* 183 *N.J.Super.* 285, 290, 443 *A.*2d 1082 (App.Div.1982) (concluding that "it is firmly settled that traffic safety and aesthetics" are "substantial government goals").

There is sufficient evidence that the regulation directly advances the interests of safety and appearance, satisfying the third *Central Hudson* prong. In *Hamilton Amusement Center, supra,* 156 *N.J.* at 274–75, 716 *A.*2d 1137, we noted that regulating the number and size of signs directly advanced the government's interest in eliminating or reducing the asserted negative effects of sexually oriented businesses. Similarly, size and quantity restrictions support the aesthetic and traffic goals of the ordinance at issue here.

Finally, there is no allegation that the regulations are not the least restrictive means of advancing the government's interests, meeting the fourth part of the *Central Hudson* test. That fact also satisfies that part of the time, place, and manner test requiring the narrow tailoring of the regulation while leaving open alternative means of communication. *See Hamilton Amusement Center, supra,* 156 *N.J.* at 276, 716 *A.*2d 1137.

■ We conclude the ordinance does not restrict speech based on its content and that its regulatory restrictions examined under

standards of intermediate scrutiny applicable to commercial speech are not an unconstitutional limitation of defendant's speech.

## B.

■ Defendant maintains that the permit requirement in the ordinance is an unconstitutional prior restraint on speech. Defendant can challenge the permit system even though he did not apply for, nor was denied, a permit. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 *U.S.* 750, 755, 108 *S.Ct.* 2138, 2143, 100 *L.Ed.*2d 771 (1988).

## 1.

Defendant first argues that the requirement that applicants must furnish sign text before being issued a permit to erect a sign constitutes a prior restraint.

■ An ordinance that imposes a permit requirement in order to engage in communicative conduct is permissible if it includes "narrow, objective and definite standards to guide the licensing authority." *Shuttlesworth v. City of Birmingham,* 394 *U.S.* 147, 151, 89 *S.Ct.* 935, 938, 22 *L.Ed.*2d 162, 167 (1969). The granting of a permit, however, cannot be based on the uncontrolled will of an official. Unbridled discretion granted by a statute or ordinance renders it unconstitutional even if applied in a constitutional manner. *See FW/PBS, Inc. v. City of Dallas,* 493 *U.S.* 215, 225–26, 110 *S.Ct.* 596, 605, 107 *L.Ed.*2d 603, 618 (1990).

■ Here, the ordinance establishes specific and objective standards for granting a permit. An official reviewing an application can refuse to grant a sign permit based only on the number, size, location and placement of the signs, and whether the sign conveys an "on-site" or "off-site" message. As with any ordinance, officials have some inevitable margin of discretion. That discretion, however, is limited by the specific standards and subject to administrative and judicial review. Moreover, the require-

ment that an applicant submit the sign text is not tantamount to unbridled official discretion. *See, e.g., Outdoor Systems v. City of Mesa,* 997 *F.*2d 604 (9th Cir.1993) (upholding constitutionality of sign ordinance that required applicants to submit sign's content in order to receive permit because content was examined to classify speech as commercial or noncommercial).

2.

Defendant next argues that the ordinance's requirement that an applicant pay permit fees before erecting a sign constitutes a prior restraint.

"A state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania,* 319 *U.S.* 105, 113, 63 *S.Ct.* 870, 875, 87 *L.Ed.* 1292, 1298 (1943). However, "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question" is permissible. *Id.* at 113–14, 63 *S.Ct.* at 875, 87 *L.Ed.* at 1298. Permit fees must operate to "meet the expenses incident to the administration of the act and to the maintenance of the public order in the matter licensed." *Cox v. State of New Hampshire,* 312 *U.S.* 569, 577, 61 *S Ct.* 762, 766, 85 *L.Ed.* 1049, 1054 (1941).

The ordinance requires any person or business to pay a fee before erecting a sign measuring more than eight square feet. The ordinance's permit fees are modest, if not nominal. *See, e.g., National Awareness Found. v. Abrams,* 50 *F.*3d 1159, 1166 (2d Cir.1995) (holding that $80 registration fee imposed on fundraisers is nominal). The maximum fee, $150, is not facially excessive or unreasonable, and will not deter a commercial enterprise from erecting a sign.

3.

Finally, defendant argues that the permit requirement of the ordinance is a prior restraint because it fails to satisfy procedural due process.

In *FW/PBS, Inc., supra*, the Supreme Court held that the licensing system of a First Amendment-protected business must provide two essential safeguards: (1) the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained; and (2) there must be the possibility of prompt judicial review in the event that the license is erroneously denied. 493 *U.S.* at 228, 110 *S.Ct.* at 606, 107 *L.Ed.*2d at 620.

 The ordinance, on its face, does not establish a time limit within which a permit application must be reviewed. *See Code* § 126–715(G) (explaining procedure for issuing or refusing permits). Nevertheless, a Township official testified that the administrative procedure tracks the guidelines of the Uniform Construction Code, requiring a permit to be issued or denied within twenty working days. This time limitation is sufficient to meet due process requirements. Furthermore, the Development Regulations explicitly provide for a 120–day time limit for the Zoning Board to review appeals of denials of zoning permits. *Id.* at § 126–807. That provision, which is derived from *N.J.S.A.* 40:55D–73, is a reasonable time period, especially in light of limited municipal resources. Finally, procedural due process is satisfied by the prompt judicial review accorded by a defendant's right to appeal to the Law Division. *See R.* 4:69–6; *Michelotti Realty Co., Inc. v. Saddle Brook Tp. Zoning Bd.,* 191 *N.J.Super.* 568, 572, 468 *A.*2d 709 (App.Div.1983).

## C.

Defendant contends that the ordinance is unconstitutionally vague because it does not state expressly that in-window displays are subject to its requirements.

 A law is void if it is so vague that persons " 'of common intelligence must necessarily guess at its meaning and differ as to its application.' " *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 118, 462 *A.*2d 573 (1983) (quoting *Connally v. General Constr. Co.,*

269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926)). Vagueness in any regulation "creates a denial of due process because a failure to provide notice and warning to an individual that his or her conduct could subject that individual to criminal or quasi-criminal prosecution." *State v. Hoffman,* 149 *N.J.* 564, 581, 695 *A.*2d 236 (1997). The vagueness doctrine requires that laws that impose criminal penalties or impede First Amendment interests be strictly scrutinized. *Karins v. City of Atlantic City,* 152 *N.J.* 532, 541–42, 706 *A.*2d 706 (1998); *State v. Cameron, supra,* 100 *N.J.* 586, 592, 498 *A.*2d 1217 (1985). Even subject to that more exacting and critical standard, however, an ordinance may be written in "broad terms, provided it is controlled by a sufficient basic norm or standard. It need not be minutely detailed to cover every possible situation." *Karins, supra,* 152 *N.J.* at 542, 706 *A.*2d 706. Moreover, commercial regulations are considered impermissibly vague only if the law is "substantially incomprehensible." *In re Loans of N.J. Property Liab. Ins. Guar. Ass'n,* 124 *N.J.* 69, 78, 590 *A.*2d 210 (1991).

 The ordinance here is not facially vague. There are many conceivable "attention attracting devices" that would logically fall within its definition of "sign." In fact, it is common for sign ordinances to define "sign" broadly, employing the phrase "any attention attracting device." *See* Edward H. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 14A.03 (4th ed.1995).

 Further, the ordinance is not void for vagueness as applied to this defendant. Defendant's transparencies were designed solely to advertise to the general public and attract the attention of passersby. It was reasonable for defendant to expect that his transparencies would be subjected to the signage restrictions.

### D.

Defendant asserts that the ordinance has been selectively enforced against him, thereby violating his Fourteenth Amendment right to equal protection of the laws.

Discriminatory enforcement of an otherwise impartial law by state and local officials is unconstitutional. *Cox v. Louisiana*, 379 *U.S.* 559, 568–71, 85 *S.Ct.* 476, 482–84, 13 *L.Ed.*2d 487, 494–96 (1965); *Yick Wo v. Hopkins*, 118 *U.S.* 356, 373–74, 6 *S.Ct.* 1064, 1073, 30 *L.Ed.* 220 (1886) (holding that law is unconstitutionally enforced "if it is applied and administered by public authority with an evil eye and an unequal hand"). Government, however, is afforded broad discretion to decide whom to prosecute based on such factors as strength of case and general deterrence value. *Wayte v. United States*, 470 *U.S.* 598, 607, 105 *S.Ct.* 1524, 1530, 84 *L.Ed.*2d 547, 555–56 (1985). In order to establish unconstitutional enforcement of the ordinance, defendant must show both a discriminatory effect and a motivating discriminatory purpose. *Id.* at 608, 105 *S.Ct.* at 1531, 84 *L.Ed.*2d at 556. The conscious exercise of some selectivity in enforcement is not a constitutional violation unless the decision to prosecute is based upon an unjustifiable standard such as race, religion, or other arbitrary classification. *Oyler v. Boles*, 368 *U.S.* 448, 456, 82 *S.Ct.* 501, 506, 7 *L.Ed.*2d 446, 452 (1962).

Defendant presented insufficient evidence of disparate treatment. Zoning officials initiated a dialogue with defendant before issuing citations. In contrast to other potential violators, all of whom cooperated with the Township and ceased their potentially illegal activity, defendant refused to take corrective action. There is no evidence that the Township has failed to prosecute any similar violators. As the Law Division observed, defendant may have been the "most egregious violator in the municipality."

### E.

Defendant argues that the criminal fines levied for his ordinance violations constitute cruel and usual punishment because the penalty is disproportionate to the offenses of failing to apply for a permit and having excessive signage.

In order to determine whether a fine constitutes cruel and unusual punishment, the Court must examine "whether the nature of the criticized punishment shocks the general conscience and violates principles of fundamental fairness; whether comparison shows the punishment to be grossly disproportionate to the offense; and whether the punishment goes beyond what is necessary to accomplish any legitimate penal aim." *State v. Des Marets*, 92 *N.J.* 62, 82, 455 *A.*2d 1074 (1983).

A penalty is presumed valid, and "[u]nless a 'substantial showing' is [ ] made a reviewing court must respect the Legislature's will." *State in Interest of L.M.*, 229 *N.J.Super.* 88, 100, 550 *A.*2d 1252 (App.Div.1988) (upholding mandatory $1000 fine for possession of cocaine within 1000 feet of a school), *certif. denied*, 114 *N.J.* 485, 555 *A.*2d 609 (1989). "Fines alone can amount to cruel and unusual punishment under certain circumstances but the situation is rare. Generally the fines are found to be proportionate and fair." *Ibid.*

Defendant has been fined a total of $95,920 resulting from his two convictions. After the first trial, the Municipal Court fined defendant a total of $30,000. That figure was based on a fine of $500 a day for 30 days of continuous violations from October 17, 1995, the date on which the complaints were issued, and November 17th, 1995, the first date of a pretrial event. After the second conviction, the Municipal Court fined defendant an additional $102,000 for his 75 days of continuous violations from June 1, 1996 to August 15, 1996: two fines of $50,000 for excessive signage at each location, and two $1000 fines for failing to apply for a permit at each location. The Law Division reassessed the fines and lowered their amount to $65,800; it imposed fines of $350 per day, for 47 days, for each violation at both locations, totaling $1400 per day.

Although the amount of the fine for violation of the sign ordinance is large, it is not unconstitutionally excessive. It is reasonable for the Township to authorize the imposition of fines for each day defendant continued to violate the ordinance. Fur-

thermore, the fine ultimately imposed was significantly less than the maximum allowable fine even though defendant may have been the most egregious and persistent violator of the ordinance. The substantial amount of fines is rationally related to the need to deter future violations by defendant and others.

## V

For the foregoing reasons, the judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—none.