**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2659-15T4

HAUL ROAD HOLDINGS, INC.,
and POLYMERIC RESOURCES
CORP.,

    Plaintiffs-Appellants,

v.

TOWNSHIP OF WAYNE,

    Defendant-Respondent.

_____

Argued telephonically October 18, 2017 —
Decided August 13, 2018

Before Judges Simonelli and Gooden Brown.

On appeal from Superior Court of New Jersey,
Law Division, Passaic County, Docket No.
L-1866-13.

Norman I. Klein argued the cause for
appellants (Carlet, Garrison, Klein & Zaretsky,
LLP, attorneys; Norman I. Klein and Virginia
T. Shea, on the briefs).

Matthew J. Giacobbe, Township Attorney, argued
the cause for respondent (Matthew J. Giacobbe,
attorney; Lisa M. Scorsolini, Assistant
Township Attorney, on the brief).

PER CURIAM

Plaintiffs Polymeric Resources Corp. (PRC) and Haul Road Holdings, Inc. (HRH) sued defendant Township of Wayne (Township), alleging that from 1996 to 2013, the Township overcharged them for water and sewer usage fees. Plaintiffs sought recovery of the overcharges. Following a two-day bench trial, the trial court entered judgment in favor of the Township. Plaintiffs now appeal that judgment entered on November 16, 2015, and the January 19, 2016 order denying their motion for reconsideration. We affirm.

We glean the following facts from the bench trial conducted on July 27, and 29, 2015, during which two witnesses testified for plaintiffs, Sol Schlesinger,[1] PRC's president, and Arthur Quint, PRC's Vice President and Chief Financial Officer. Heather Vitz-Del Rio, the Township's Director of Public Works and Superintendent of Water and Sewer for the Township since 2002, testified for the Township.

PRC, a compounder of thermal plastics, rented property located at 55 Haul Road in Wayne from HRH, a wholly owned subsidiary of PRC. The property included a well approximately 500 feet deep, a sump pit into which water from the well was pumped and flowed through a pipe connecting the well and the sump pit,

_____

[1] Sol Schlesinger alternately appears as Saul Slessinger in the record.

machinery to process the materials, twenty-five to fifty feet vats with heated water[2] to melt the thermal plastics, warehouse space, a shipping and receiving area, and administrative offices. According to Schlesinger, the company employed about fifty people during the day and twenty people during the night shift.

Generally, to operate, PRC used water from its well for production and water supplied by the Township for domestic use. PRC also utilized the Township's sewer system for any water discharged back into the sewer system. Pursuant to Township Ordinance No. 17-2006, the Township based water service charges on gallons consumed, which rates increased every year from 2006 through 2010, after which they remained the same throughout the time period in question. Under the Ordinance, the Township billed customers for the first 12,000 gallons of water supplied at a flat fee based on the size of the meter. The water rates then increased according to three tiers of use in excess of 12,000 gallons as follows: 12,000 to 30,000 gallons, 30,000 to 80,000 gallons, and 80,000 gallons and above. At each tier, a different rate applied for every thousand gallons supplied. For example, in 2010, at the first tier, the Township charged $5.53 per one thousand gallons;

---

[2]  Schlesinger estimated that the vats held about 200 gallons of water.

at the second tier, $5.60 per one thousand gallons; and at the third tier, $5.67 per one thousand gallons.

Additionally, the Township charged commercial and industrial properties, like PRC, sewer service fees based on actual water usage.  Every quarter, the Township charged the property a flat fee of $99 in addition to $4.20 for every one thousand gallons above 23,700 gallons used each quarter.  If the water supplied did not flow back through the sewer system, the Township calculated its sewer service fees by deducting that amount of water from the recorded consumption total.  A sewer deduct meter measured the amount of water supplied by the Township to the facility that did not flow back through the sewer system.  The water supply generally flowed in one direction but could flow backwards through the sewer system if a backflow preventer, licensed by the State and inspected by the Township, was not installed on the line.  PRC had no backflow preventer.

In order to measure water and sewer charges, the Township installed three separate meters at the PRC facility.  A main flow meter, located in an exterior pit, recorded the amount of water the Township supplied to PRC through a two-inch line.  Once the water entered the facility, it dispersed into three different directions.  One line supplied water to the boiler room, where water was used for heat and air conditioning.  This line was

metered with a 5/8 inch sewer deduct meter. A second line supplied water to the production area for use in the cooling towers and had a two-inch sewer deduct meter. A valve controlled the flow of water to this line, which remained locked with a chain unless a manager manually opened it to allow the flow of Township water to PRC's production process. When that occurred, the purpose of the deduct meter was to subtract that amount of water from the water coming in on the main flow meter. A third line provided water for general domestic use, such as water for the restrooms, kitchen sinks, laboratory sinks, and emergency showers. That line was not separately metered.

In a drawing identified as P-5 in evidence, Schlesinger described the water system as it flowed through the PRC facility. According to Schlesinger, PRC primarily used water from its well in its production process. The well produced about 125 gallons of water per minute. However, the well had no meter or other device attached to it to measure the amount of water supplied. PRC used water in the cooling towers in its production process to cool the plastic extruders.[3] Water was recirculated through the

---

[3] Schlesinger described an extruder as "basically a long spiral screw about [twenty] to [twenty-five] feet long . . . with a barrel around it, made of . . . hardened steel . . . with heater bands, which brings the temperature up to about 600 degrees." The extruder "melts the product and then . . . pumps it out to a series

cooling towers and then either recycled in the cooling towers or lost through evaporation. Depending on the time of year and temperature, some percentage of water was inevitably lost due to evaporation and replaced by well water or, on some occasions, by Township water. PRC had no methodology for measuring evaporation.

According to Schlesinger, in the past thirty years, PRC had to use Township water in its production process on only three or four occasions to compensate for a water shortage from the well. Those occasions occurred when there were problems with the well, including instances where the well collapsed, the pump broke and needed to be replaced, or a drought caused a low water table. For example, in February 2015, the well was shut down for approximately two weeks because a pump and pipe had to be replaced, resulting in PRC relying exclusively on Township water.

When PRC used Township water in its production process to replace or supplement water normally supplied by its well, the water eventually evaporated or overflowed onto the ground, but did not travel back through the sewer system. Schlesinger testified that from 2000 to the present, he was unaware of any broken water

---

of holes and dye[,]" which are then "taken into water bath[s] where [they] get solidified and from the water bath . . . to a pelletizer, which basically chops it into little pebbles" which are then dried, packaged and shipped to customers for use as "injection molding[.]"

lines, other than a minor leak in one of the hydra lines that was repaired on the same day.

Prior to 1996, PRC's quarterly billings for water usage ranged from roughly $2300 to $6000. However, from 1996 until the last quarter of 2012, the bills increased substantially with the 2012 fourth quarter bill totaling over $22,000.[4] Over that time period, PRC amassed a delinquent account of over $200,000. In early 2013, PRC began the process of refinancing its debt and was required to pay the delinquent water bill in order to facilitate the refinancing. Prior to paying, PRC representatives met with Township officials to question the billings, claiming that they were billed based on estimates rather than "actual" meter readings. After investigating the meters and verifying the meter readings, the Township maintained the billings were accurate.

According to Vitz-Del Rio, the Township billed PRC quarterly for water and sewer charges based on meter readings. Initially, Township employees physically entered the property, read the meters directly from the dial, and manually entered the reading into a book. Later, the meter readings were upgraded to "the ARB system[,]" which meant the meter readers had to physically touch every remote to obtain a meter reading. Thereafter, radio

---

[4] The first quarter bill for 2013 reverted to approximately $4600.

frequency remotes were installed, allowing meter readers to pick up readings from a remote device connected to the meters and wired to a radio frequency located on the outside of the PRC building. Meter readers then used a hand-held wand-like device to record the reading on the meters without having to physically touch the meters or access the buildings.

After the meter readers collected the readings in their hand-held units, the data was downloaded onto a computer, after which it was transferred to the Township's billing software. Bills for properties with more than two meters, like PRC, were produced manually from the Township's billing software because the software could only bill for two meters per account. The meter reading report used to produce the bills specified the meter reading, water usage, any usage in excess of 12,000 gallons and the type of reading for each quarter. The number in the water usage column was calculated by deducting the previous quarter's reading from the current quarter's reading. If an estimate was used, it was designated with an "E" in the column titled "Est Flag."

According to Vitz-Del Rio, none of the bills for any of the meters at the PRC facility were estimates but were, in fact, actual readings. She also testified that the installation of the radio frequency remotes did not affect the functionality of the meters. In upgrading to the new system, the Township had to change only

the dial on the top of one of the meters at the PRC facility, but the other two meters remained unaltered. Vitz-Del Rio confirmed that from 2008 to 2015, PRC's meters were not changed or repaired by the Township and she was unaware of any malfunction. She explained that ordinarily, the water consumption registered on the sewer deduct meters should not exceed the consumption registered on the main in-flow meter, but attributed such an occurrence to "something else . . . being introduced" into the system.

Nonetheless, PRC claimed that from 1996 to 2013, the Township overcharged them for water and sewer usage fees, and, after it complained, the Township repaired the defective meters, resulting in subsequent bills reflecting accurate charges. To support its claim, in P-3 in evidence, Quint calculated PRC's domestic water usage by subtracting the meter reading on the meter measuring the amount of water the Township supplied from the readings on the sewer deduct meters measuring the amount of water flowing from the production and boiler lines. According to Quint, prior to 2013, the Township billed PRC for approximately one to two million gallons of water each quarter. However, after 2013, the domestic water usage noted in Quint's calculations reflected that the Township billed PRC for approximately 98,000 to 481,000 gallons of water for domestic use. The amount of water supplied to the boiler line also decreased significantly.

Based on the change in domestic and boiler water usage reflected in the billings before and after 2013, in May 2013, PRC filed a complaint against the Township, which was later amended, alleging breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and negligence. PRC claimed that since 1996, the Township had overcharged it for water service charges and sewer fees by allowing the sewer deduct meters located on the property to either malfunction or remain in a state of disrepair or by failing to read the meters correctly. It also claimed the water and sewer bills issued by the Township were estimates, rather than actual readings of their water and sewer usage consumption. The Township filed a contesting answer and affirmative defenses, including failure to state a claim for which relief can be granted.

At trial, Quint calculated PRC's damages in a chart identified as P-1 in evidence. For each bill, Quint divided the gallons of water the Township supplied and billed PRC by PRC's production, in pounds, for that quarter. He then divided the gallons of water the Township billed PRC for water flowing through the sewer system by PRC's production, in pounds, for that quarter. The production numbers he used reflected production that was completed using both the Township's water and PRC's well water. For each quarter,

Quint added those two ratios (water consumed/production + water in sewer system/production) together.

For the contested billing period from 1995 to the first quarter of 2013, he averaged the total ratios he had calculated for each quarter. He did the same for the non-contested billing period from the second quarter of 2013 to the first quarter of 2015. To calculate the damages, he multiplied the difference of those two averages by the total water and sewer charges the Township billed PRC during the contested time period, amounting to $361,107 in damages. This analysis did not include missing bills or the bill from the first quarter of 2015 during which time PRC admittedly relied exclusively on the Township's water supply in its production process because its well was in disrepair.[5] It also did not account for the amount of water PRC used from its well, evaporation rates or increasing billing rates.

Following the bench trial, in a November 16, 2015 written decision and accompanying order, the trial judge awarded final judgment in favor of the Township and dismissed the complaint with prejudice. Preliminarily, the judge noted that he "considered the evidence presented by the parties including trial testimony,

---

[5] Notably, the billing for this quarter reflected water consumption totaling 2,240,000 gallons, which was approximately the same amount as the challenged quarters.

exhibits, proposed findings of facts, conclusions of law and arguments of counsel."

In rejecting plaintiffs' claim that the Township breached the implied covenant of good faith and fair dealing, the judge determined that plaintiffs produced "no evidence that the Township has acted in bad faith or with improper motive." Further, citing Callano v. Oakwood Park Homes Corporation, 91 N.J. Super. 105 (App. Div. 1996), the judge determined that "[p]laintiffs' assertion of breach of contract based on a valid contractual relationship with the Township preclude[d] an equitable claim for unjust enrichment." Regarding the negligence claim, the judge concluded that plaintiffs "produced no evidence, expert or otherwise, to support a claim sounding in negligence." The judge rejected plaintiffs' "argument that [res ipsa loquitur] applie[d]" because "the meters in question were not under exclusive possession and control of the Township."

Turning to the breach of contract claim, the judge noted there was no "dispute that a contractual relationship existed between [the parties,]" in that "[t]he Township provided water and sewer services and the [p]laintiffs paid for those [services] based on the Township's billing." The judge also acknowledged the existence of an implied contract between the parties for the Township to provide and bill for sewer services "in accordance

12                                                    A-2659-15T4

with [Wayne, N.J., Code § 159-18 (2013)]." According to the judge, "[§] 159-18 requires that 'the <u>user</u> . . . supply the necessary metering devices to measure the flow that enters the Township system.'" Further, under Section 159-18B, "[w]here the water is taken from a source other than the Township water system, such source shall be metered by the <u>user</u>, and the quarterly sewer [charge] will be based on the reading of that meter."

The judge continued that

> [b]ased on Code 159-18, the [p]laintiffs as "users" are obligated to supply the metering devices on their premises. They are further obligated to meter their well as a second source of water on their premises.
>
> Thus, [p]laintiffs' claims that the Township breached its contract by supplying defective or malfunctioning meters to [p]laintiffs fails based upon Code 159-18 alone. It was not the Township's obligation to supply the meters. More importantly, however, is this [c]ourt's finding that [p]laintiffs have produced absolutely no evidence to show that any of the meters malfunctioned or were defective in any way.
>
> This [c]ourt was presented with no proof of actual repairs or replacement of any of the meters. Thus, what is left for the [c]ourt to consider is whether the Township breached its contract by improperly billing [p]laintiffs for the water and sewer services provided.

Initially, the judge determined that based on Vitz-Del Rio's testimony, it was undisputed that the Township billings were based

on "actual readings and not estimates." The judge also acknowledged that "PRC's domestic use of water has remained relatively constant over the years." The judge noted further that plaintiffs' alleged breach of contract claim was "based entirely on the actual bills and reports prepared by the Township" and the billing analysis presented in P-1, which included seventy-six quarterly bills dating back to 1995, seventy of which were challenged by plaintiffs. The judge pointed out that plaintiffs did not challenge the remaining six bills from April 6, 2013, to January 13, 2015.

In addressing alleged billing inconsistencies, the judge recounted Schlesinger's and Quint's testimony "alleg[ing] mistakes in the billing."

> For example, both reviewed an actual bill generated for the fourth quarter of 2012 . . . . That bill listed the water consumption at 2,325,000 gallons. When compared to the Township's account report . . . , there was a discrepancy since [the report] listed water consumption at 200,000 gallons for the same period. It is clear that these two documents are inconsistent. However, it is not clear that the actual bill . . . was incorrect. It is certainly possible that the Township's account report was incorrect. In fact, the evidence produced in this case seems to support the billing number (2,325,000 gallons).

Similarly, turning to the sewer charges, the judge explained:

A review of P-1 . . . shows that the $7,795.00 billed that quarter for sewer charges was not inconsistent with the sewer bills for previous quarters and in fact was _less than_ the sewer charges for five of the previous eight quarters (10/15/2000 to 7/13/2012). Further the $12,984 billed that same quarter for water was _less than_ the water charges for six of the previous eight quarters.

Based on this analysis, the judge was "simply unable to conclude from the highlighted billing inconsistencies that the plaintiffs[] were in fact overcharged." Thus, the judge found that plaintiffs "failed to establish a breach of contract by a preponderance of the evidence submitted."

The judge continued that even if plaintiffs had proven a cause of action, the claim would still fail because "[p]laintiffs failed to adequately prove damages." According to the judge, "[p]laintiffs produced no expert analysis regarding damages" but instead, submitted Quint's "calculation of damages [using] a ratio that _he created_ using [plaintiffs'] own production numbers[,]" which analysis admittedly omitted "the rate increases" prescribed by the Township Ordinance and omitted plaintiffs' unmetered "well water usage[.]" The judge found "Quint's analysis to be nothing more than mere speculation" and concluded that "[t]he proofs [did] not adequately explain how that ratio was developed" or "support

his alleged correlation between production and [plaintiffs'] use of Township water."

Additionally, the judge determined that "the damages sought by [p]laintiffs would be significantly limited by the applicable statute of limitations to those damages sustained after May 23, 2007[,] which [was] six years prior to the filing of the [c]omplaint. . . ." According to the judge, because "damages for a period beyond the six[-]year statute of limitations were not presented 'on the face of the complaint,' . . . the Township's failure to specifically assert a statute of limitations bar as a defense [did] not act as a waiver at the time of trial" because the Township pled "'failure to state a claim upon which relief can be granted' as an affirmative defense." Finally, the judge noted that plaintiffs' September 30, 2015 motion in limine "seeking an order permitting the . . . admission into evidence [of] an affirmation of . . . Quint" with an accompanying exhibit or "[i]n the alternative . . . to re-open the trial[,]" was "improper as it was made two months after the trial ended" and plaintiffs had the opportunity to present the evidence at the trial.

Plaintiffs moved for reconsideration pursuant to Rule 4:49-2, asserting that the court misinterpreted Section 159-18, and overlooked evidence, specifically P-3 in evidence, which was Quint's calculation of water for domestic use from a summary of

bills from July 15, 2009 to July 13, 2015, with a breakdown of water consumption for flow, production, boiler and domestic use. On January 19, 2016, in an oral decision, the judge denied plaintiffs' motion. The judge determined that he did, in fact, review exhibit P-3, explaining,

> I did not mention P-3 in my decision. I didn't mention a lot of specific documents. I do mention in my opinion that I considered all of the evidence that was marked at trial, which included P-3 . . . .
>
> [A]lthough I didn't mention it, . . . the information was reviewed, so there's no need for me to reconsider under [Rule] 4:49-2 based upon P-3.

The judge reiterated that plaintiffs failed to meet their burden of proof and again rejected plaintiffs' claim that proof of billing inconsistencies indicated the Township overcharged PRC. In addition, the judge specified that Section 159-18 had very little effect in and of itself on his ultimate decision. According to the judge:

> [W]ith regard to the inconsistencies, . . . [t]here were clearly some discrepancies when you compared the bills to the [T]ownship reports. . . . But . . . I . . . focused on what was the total bill[.] What were the bills for sewer and what were the bills for water over this period of time and it was a significant period of time, even if I were to limit everything to the [s]tatute of [l]imitation time period.

17

> And my decision was based upon all of that review. . . . [P]laintiff[s] simply didn't meet its burden with regard to a breach of contract claim. . . . But I want to be clear that this decision didn't turn on . . . my reading of that ordinance.
>
> [T]he ordinance . . . based upon my interpretation, requires a meter for the well, but that in and of itself really has very little effect on my ultimate conclusion in the case. Because this is about what was metered and whether or not there was an appropriate bill for those meters. . . .
>
> [So] . . . [t]his really was . . . a defective billing case . . . .

As to damages, the judge reiterated:

> I [also] pointed out that since I didn't find a breach of contract[,] I didn't have to get to damages. But . . . even if I had found by a preponderance of the evidence that [there] was a breach, . . . I couldn't come up with a firm amount on the damages.

Finally, regarding plaintiffs' in limine motion, the judge stated:

> I didn't think [the in limine motion] was appropriate. But more importantly[,] it didn't really change the evidence in the case. I had P-1. . . . [T]his extra information . . . that [plaintiffs' counsel] tried to . . . bring after the trial was completed was really just kind of . . . a further explanation . . . of some of the evidence that I already considered.

This appeal followed.

On appeal, plaintiffs raise the following points for our consideration:

POINT I[6]

THE COURT'S FINDING THAT ACTUAL DOMESTIC WATER USAGE REMAINED CONSTANT SHOULD HAVE GENERATED A FINDING THAT THE TOWN OVERBILLED PRC, AS THE TOWNSHIP'S BILLING DATA SHOWED A MARKED DECLINE IN DOMESTIC [CONSUMPTION] AFTER PRC COMPLAINED OF OVERBILLING.

POINT II

THE COURT ERRED IN MISAPPLING A MUNICIPAL ORDINANCE.

POINT III

THE COURT ERRED IN FAILING TO CONSIDER PRC'S PROFFER OF DAMAGES.

POINT IV

THE COURT ERRED BELOW IN APPLYING THE STATUTE OF LIMITATIONS WHEN THE TOWNSHIP WAIVED SUCH AFFIRMATIVE DEFENSE.

POINT V

THE COURT ERRED BELOW IN FAILING TO CONSIDER PRC'S SUBMISSION REGARDING TRUNCATED DAMAGES.

We have considered these arguments in light of the record and applicable legal principles. We reject each of the points raised and affirm.

Our review of a trial court's fact-finding in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "The general rule is that findings by the trial court

---

[6] We have condensed the points for clarity.

are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We owe "deference to those findings of the trial judge which are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Locurto, 157 N.J. 463, 471 (1999) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We "do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice. . . ." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

Similarly, our standard of review on a motion for reconsideration is deferential. "Motions for reconsideration are governed by Rule 4:49-2, which provides that the decision to grant or deny a motion for reconsideration rests within the sound discretion of the trial court." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015). "Reconsideration should be used only where '1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did

not consider, or failed to appreciate the significance of probative, competent evidence.'" Ibid. (alterations in original) (quoting Capital Fin. Co. of Delaware Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008)). "Thus, a trial court's reconsideration decision will be left undisturbed unless it represents a clear abuse of discretion." Ibid. An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

Plaintiffs' arguments on appeal are directed at the judge's rejection of their breach of contract claim. In a claim for breach of contract,

> [o]ur law imposes on a plaintiff the burden to prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]."
>
> [Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (alterations in original) (quoting Model Jury Charge (Civil), § 4.10A "The Contract Claim-Generally" (May 1998)).]

Here, plaintiffs failed to carry their burden of proof to establish all the elements of their cause of action. We are satisfied that the judge's factual findings and legal conclusions to that effect are supported by the record, and the judge's denial of plaintiffs' motion for reconsideration reflects an appropriate exercise of discretion.

Plaintiffs argue the trial judge did not "fully and adequately" consider the data in P-3, which "clearly show[ed] that domestic water usage decreased dramatically shortly after the Township inspected its water meters and its billing in January 2013." According to plaintiffs, "[s]ince the change was not accounted for by PRC's usage, it had to be the result of defective meters or . . . billing errors." Additionally, plaintiffs assert the judge failed to adequately consider the multiple inconsistencies contained within the bills themselves.

Viewed through the lens of the deferential standard we accord the judge's factual findings, we discern no basis for intervention. In ruling on the motion for reconsideration, the judge confirmed that he considered P-3. The judge also underscored that plaintiffs produced no evidence demonstrating that any of the meters malfunctioned or were defective. Additionally, while acknowledging inconsistencies between the Township's billing records and its internal reports, the judge was unable to conclude

22

given the other evidence in the case that the billing inconsistencies proved that the plaintiffs were overcharged.

Next, plaintiffs argue that the judge erred in applying Section 159-18 "to dismiss PRC's claim that the Township supplied defective or malfunctioning meters." According to plaintiffs, because the Ordinance "pertains only to discharge of well water to 'sewers,' and does not pertain to water supplied by the Township[,]" the judge either misinterpreted the Ordinance "as requiring a property owner to supply its own water meters" or "failed to appreciate the significance of the probative evidence that PRC's well water never entered the sewer system." We disagree.

"The established rules of statutory construction govern the interpretation of a municipal ordinance." Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999). Therefore, courts interpret an ordinance to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." Ibid. (quoting Merin v. Maglaki, 126 N.J. 430, 435 (1992)). First, courts examine the ordinance's language. Ibid. If it is clear and unambiguous, a plain meaning reading of the ordinance governs. Ibid. If it is susceptible to at least two different interpretations, the court must look at extrinsic evidence such as its purpose and legislative history and the overall statutory

scheme. <u>Ibid.</u> "Above all, the [c]ourt must seek to effectuate the 'fundamental purpose for which the legislation was enacted.'" <u>Ibid.</u> (quoting <u>N.J. Builders, Owners & Managers Ass'n v. Blair</u>, 60 N.J. 330, 338 (1972)). We review questions of law such as these de novo. <u>Allstate Ins. Co. v. Northfield Med. Ctr., P.C.</u>, 228 N.J. 596, 619 (2017).

Section 159-18 governs the Township's sewer rental fees for commercial and industrial properties and provides that:

> The user will supply the necessary metering devices to measure the flow that enters the Township system. Where the water is taken from a source other than the Township water system, such source shall be metered by the user, and the quarterly sewer charge will be based on the reading of that meter.

We agree with the judge's interpretation of the Ordinance. Contrary to plaintiffs' assertion, the ordinance does not qualify "necessary metering devices" by stating that users must provide only discharge meters or only provide a meter if they anticipate water entering the sewer system. Rather, the ordinance expressly states that metering devices are required <u>to</u> measure the flow into the sewer system — not <u>if</u> the water flows into the sewer system. (Emphasis added). Otherwise, the Township would have no way to verify sewer rental fees other than by relying on a customer's claims.

Furthermore, the ordinance specifies that users "will supply" the necessary metering devices, and requires the user to supply the meter "[w]here the water is taken from a source other than the Township water system[.]" Thus, the ordinance requires that plaintiffs, as the potential users of the sewer system, supply any meters necessary to measure the flow of water into the sewer system, regardless of the amount or the source. In any event, the judge's finding was predominantly based on plaintiffs producing "no evidence to show that any of the meters malfunctioned or were defective in any way[,]" more so than the application of the ordinance.

Plaintiffs' remaining arguments attack the judge's findings with respect to damages. However, because we conclude that plaintiffs failed to establish the requisite breach of the contract, we need not address plaintiffs' remaining arguments.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2659-15T4