**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3698-19

ALLAN B. BRAGGIN,

     Plaintiff-Appellant,

v.

BOROUGH OF RAMSEY,
MAYOR DEIRDRE DILLON,
in her individual and official
capacity, and STEVE FORBES,
in his individual and official
capacity,

     Defendants-Respondents.

_____

Argued September 20, 2021 – Decided January 6, 2022

Before Judges Sabatino, Mayer, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-6101-18.

Richard D. Picini argued the cause for appellant (Caruso Smith Picini, PC, attorneys; Richard D. Picini, of counsel and on the briefs).

Mary C. McDonnell argued the cause for respondents (Pfund McDonnell, PC, attorneys; David T. Pfund,

Mary C. McDonnell, and Joseph A. Keane, on the brief).

PER CURIAM

Plaintiff Allan B. Braggin appeals from an April 24, 2020 Law Division order granting defendants Borough of Ramsey, Mayor Deidre Dillon and Steve Forbes' motion for summary judgment and dismissing his two-count complaint in which he alleged defendants violated the New Jersey Civil Rights Act (NCRA), N.J.S.A. 10:6-1 to -2, based on their purported selective prosecution of the Borough's zoning laws and in retaliation for exercising his First Amendment rights at public hearings. We affirm.

I.

In our review of the record, we viewed the facts and all reasonable inferences therefrom in the light most favorable to plaintiff, the party against whom summary judgment was entered. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c). Applying that standard, the record before the trial court established the following facts.

Plaintiff and his wife have lived at the same home in Ramsey for nearly fifty years. At various times during that period, plaintiff stored approximately seven or eight cars and flatbed trailers on his property along with at least four canopies, or storage sheds. The condition of plaintiff's property led to three

A-3698-19

investigations by municipal zoning officials in 2012, 2015, and 2016, and ultimately to the issuance of numerous municipal summonses. We detail those investigations to provide context for our opinion.

A. The 2012 Zoning Investigation

On October 23, 2012, plaintiff received a letter from Richard Mammone, Ramsey's former zoning officer, notifying him that a neighbor had complained about the condition of his property. The letter noted that Mammone had also observed several violations at plaintiff's residence, including "[n]umerous unregistered or junk vehicles on the property . . . [n]umerous storage sheds or pods . . . [and] [p]roperty maintenance violations . . . [including] storage of construction materials, metal scrap and other debris."

Plaintiff testified that when Mammone came to inspect the property he spoke on the phone with Borough Attorney Peter Scandariato, who allegedly told him not to worry about the canopies or sheds because they were "grandfathered." The motion record, however, is devoid of written documentation from the Borough confirming that plaintiff's canopies were grandfathered, and not in violation of municipal zoning regulations.

On December 6, 2012, Mammone sent plaintiff another letter stating that "[t]he area in the rear of [his] lot ha[d] been satisfactorily cleaned . . . [t]he area

along the southernly side of [his] lot require[d] additional cleanup . . . [and] [a]ll unregistered or inoperable vehicles must be removed." No summonses were issued, however.

Plaintiff also alleged that Scandariato physically assaulted him prior to a public meeting in 2014. According to plaintiff, Scandariato, "lunged at [him], put his hands on the wall, came into [his] face with his body within inches of [his] face, screaming and swearing in a red face puffed out manner, saliva spewing on [his] face." Plaintiff, however, never filed charges against Scandariato, nor did he name him as a defendant in this action.

B. The 2015 Investigation and Enforcement Action

On March 11, 2015, plaintiff's neighbor emailed Mammone complaining about overgrown shrubs, dilapidated structures, and peeling paint that he observed on plaintiff's property. On March 20, 2015, Mammone went to plaintiff's property to investigate the complaint and plaintiff responded by contacting the police, alleging Mammone was trespassing.

Ramsey police subsequently arrived at plaintiff's residence and completed an investigation report. The report stated that plaintiff felt that he was being "harassed" by Mammone, who informed the police he was investigating a complaint in his official capacity as zoning officer.

4

On March 23, 2015, Mammone sent plaintiff a letter addressing the March 20, 2015 incident. He explained that a "complaint ha[d] been received regarding zoning violations on [plaintiff's] property," specifically, that bamboo planted on plaintiff's property was overgrown, plaintiff had exceeded the permissible number of sheds on the property, and the property was covered in debris. The letter further advised plaintiff that he had thirty days to correct the violations, and his failure to do so would result in the issuance of a summons.

On April 2, 2015, Mammone received a letter from plaintiff acknowledging the conditions and detailing his progress to remedy the above referenced violations. Plaintiff confirmed that he had cut the bamboo back to his property line. Plaintiff maintained, however, that Scandariato previously found that his "temporary" sheds were "'grandfathered' as they preceded the local [ordinance] about them." He further noted that the matter was "closed out" and Mammone had given him "a clear OK." Plaintiff also requested a thirty-day extension to remediate the remaining violations.

On April 7, 2015, Mammone granted plaintiff a thirty-day extension. Significantly, Mammone also advised plaintiff that Scandariato had no "recollection of advising that the sheds mentioned in [his] letter of March 23,

5

2015, were grandfathered." He also noted that any sheds installed after 1975 would be in violation of municipal zoning ordinances.

On May 8, 2015, plaintiff informed Mammone that he was advised by Scandariato that as long as he made a good faith effort in correcting the violations Mammone "would be agreeable to grant further extensions." He also stated that the canopies had been on the property for many years and reiterated that there was no problem with them in 2012. Further, plaintiff "sought clarification" on why the "(shed/pod) violations" were "removed" in 2012. In addition, plaintiff stated that due to his age and health, he needed an additional ninety-day extension to remove the canopies as there was "years of accumulated items" in them.

Mammone responded on May 13, 2015 that his "policy as Zoning Officer has been to grant extensions of time if the violations are being corrected in a timely manner." He noted, however, that he cannot make that determination unless he was able to inspect the property and he would not grant a further extension unless he was permitted to view the property.

Mammone further clarified that "the time frame of when the sheds were installed could not be determined with any certitude in 2012" and that he was provided with aerial photographs from 2002 that "indicate the sheds were

6

erected after that date in violation of the maximum number of sheds permitted by the code." On May 26, 2015, plaintiff emailed Mammone explaining that he was "welcome to observe [the] property from [the] property line." In response, Mammone scheduled an inspection for June 10, 2015 and notified plaintiff that if he was "unable to verify progress in remediation of the violation a municipal summons [would] be issued."

On June 5, 2015, plaintiff emailed Mammone confirming that he and Mammone had agreed to conduct the inspection on June 11, 2015. Plaintiff also stated that he intended to "purchase an enclosed trailer to secure and protect from the weather valuable items . . . stored in the canopies." On June 11, 2015, Mammone and Bruce Vozeh, the Borough Administrator, conducted an inspection of plaintiff's property.

Mammone thereafter sent plaintiff a letter on July 13, 2015 from Scandariato, dated June 23, 2015, which explained that the "sheds existing at the subject property are not temporary storage containers" within the meaning Chapter 27 of the Borough Code. Scandariato stated that the sheds were instead improperly constructed "accessory buildings" subject to Chapter 34 of the Borough Code.

On July 30, 2015, Mammone sent a letter to plaintiff acknowledging his demand to "rely on [his] word that the cleanup is progressing." Mammone noted that he agreed to grant thirty-day extensions to allow plaintiff the necessary time to "obtain a trailer that [he] believe[ed would] ameliorate the violations." Nonetheless, Mammone stated that "prior to granting a [thirty day] extension, a follow-up inspection" would be required.

On August 7, 2015, plaintiff wrote a letter to Mammone summarizing a meeting he had with him on August 6, 2015. Plaintiff explained:

> I repeated that on [June 11, 2015] []Vozeh, . . . and you . . . conducted an on-site inspection and discussion of my property witnessed by my wife. I repeated that we had told you that no physical change to the site would be made until the "enclosed trailer" arrives and that we would give you progress reports as requested which we have done.
>
> I repeated that I had told you of the heavy racks, 6x6 timbers inside the "canopies" that had to be removed before the "canopy" structures could be taken down.
>
> I noted that once the "enclosed trailer" arrives on site I will need to move the remaining items from the "canopies" into the trailer. I estimated – [four] weeks or so to move the items into the trailer and to disassemble the racks and timbers and then take down the "canopies[.]" You … agreed.

A-3698-19

On August 21, 2015, Mammone informed plaintiff that he would only be permitted to have one trailer "exclusively for the storage of the numerous items on [the] property." A few days later, plaintiff requested that Mammone reconsider the August 21, 2015 decision and permit him to have two trailers. At some point thereafter, Mammone resigned from his position as Zoning Officer.

Plaintiff testified that during one of Mammone's inspections he explained that he had a "compulsion to attend many Borough meetings." Plaintiff alleged that Mammone responded "[w]ell now you'll have more time not to go to – to fix the issues that we have these violations of, so you won't have to go to the meetings, and you can spend your time repairing or mitigating the issues." Plaintiff stated that he believed this comment was a "veiled threat" but he "didn't really put any thought to it." Nevertheless, plaintiff kept this belief "in the background" and stopped attending public meetings for the remainder of 2015.

On June 1, 2016, plaintiff attended a public meeting regarding the Borough's senior center because he "heard no correspondence from the Borough for many, many months" about the canopy violations. Plaintiff testified that when Scandariato recognized him in the crowd he said "[o]h Mr. Braggin, I'm surprised to see you here attending a meeting."

A-3698-19

Plaintiff considered Scandariato' s expression of "surprise[]" as part of an organized plan to "silence" him. Plaintiff also stated he received "push-back" from Mayor Dillon, Vozeh, and Scandariato "on several of the issues he brought up" at the meeting and believing there "was hostility" towards him.

When asked whether he had "express[ed] any hostility towards any member of the Borough or its official employees at any meetings," he stated, "I don't consider hostility a word. There are sometimes heated discussions on disagreements. That is normal when people have different views, but my views and my statements, I try to make – I try to make with the basis of facts." Plaintiff was then asked how "hostility is not a word when it's [him] expressing [his] opinion, but it's a word you use when [defendants] are expressing their[s]?" Plaintiff explained:

> Because I'm speaking as a public comment, which is my right to express my opinion, and then negativity and hostility that is garnered back is inappropriate. Even if it's based on fact and I'm not – and if I used a louder voice or whatever, which is my emotional compassion, that shouldn't garner hostility and negativity. One should in a governing body listen and learn, as General Mattis says, leadership is listen, learn, lead.

C. The 2016 Investigation

In July 2016 defendant Steve Forbes was hired as Assistant Zoning Officer. Forbes testified that he received a complaint regarding canopies on

10

plaintiff's property and drove by the residence to investigate and document his findings with photographs.

Thereafter, on August 17, 2016, Forbes sent plaintiff a letter stating that he had "been reviewing open files" and referenced plaintiff's August 7, 2015 letter where he stated that he needed an "estimated [four] weeks or so to move the items into the trailer and to dissemble the rack timbers and then remove the 'canopies.'" Forbes further explained that he "went past [plaintiff's] residence on August 5, 2016 and did see that the trailer ha[d] arrived and [was] situated on [the] property, but the 'canopies' [were] still in place." Forbes then requested that plaintiff "provide a reason as to why [he had not] moved forward with the agreed upon time frame with the Borough."

On October 21, 2016, Forbes sent plaintiff another letter informing him that he had "recently driven by [the] property confirming that the enclosed trailer is onsite, but the canopies remain up." Forbes also told plaintiff that he had "[thirty] days to complete this task and remove all 'canopies'" and that failure to do so would result in a municipal summons. On November 9, 2016, plaintiff and his attorney met with Forbes and Scandariato to discuss the ongoing investigation.

On December 9, 2016, Forbes emailed plaintiff requesting a site visit to "verify that the [one] canopy we had agreed that would be down by the end of November has been removed." Forbes further explained that he needed "to inspect the property and to form a time frame to complete the rest of the cleanup and removal of the [canopies]."

That same day plaintiff responded stating "[t]he canopy located in the middle of [the] property was removed prior to [December 1, 2016] as indicated by the attached dated 'before and after' photographs." Plaintiff further stated that this could "easily be viewed from [the] street or Hubbard School Lane as there are no longer leaves on the trees that might obscure the view."

D. The Summonses

On December 16, 2016, Forbes sent a letter to plaintiff serving him with a series of summonses indicating plaintiff violated a Borough ordinance, for maintaining, and failing to remediate, the canopies on his property, as an improper accessory building. The summonses were issued only against plaintiff and not his wife, who plaintiff asserts also owns the property

After the matter was transferred to the Presiding Municipal Court Judge of Bergen County, plaintiff moved to dismiss the summonses which the court granted on September 7, 2017, concluding that "canopies [did] not constitute

'buildings' within the meaning of Ramsey Borough Code, Section 34-4.5."[1] Forbes testified that he did not appear for hearing on the motion to dismiss as he "was not notified."

Plaintiff filed a notice of claim against defendants and later a two-count complaint in which he alleged that Forbes and Mayor Dillon violated the NJCRA (Count I), as did the Borough (Count II). According to plaintiff, defendants engaged in a pattern of retaliatory conduct that infringed his First Amendment rights. He maintained that he was a concerned resident who frequently attended public meetings where he advocated for "good government, openness, and transparency" causing municipal officials to respond "aggressively," leading to their selective prosecution of him.

After the close of discovery, defendants moved for summary judgment. Judge Lisa Perez Friscia considered the parties' submissions, conducted oral argument, and granted defendants' application on April 24, 2020. In her accompanying written decision, the judge considered and rejected plaintiff's claims that defendants engaged in selective prosecution or constitutional retaliation, and concluded that plaintiff's constitutional rights had not been

---

[1] The record does not contain a copy of the transcript from the proceedings related to the motion to dismiss.

violated the NJCRA. The court also found that defendants Dillon and Forbes were entitled to qualified immunity under Brown v. State, 230 N.J. 84, 89 (2017). Finally, Judge Perez Friscia concluded that plaintiff failed to establish that any municipal official infringed upon his constitutional rights and, as such, did not need to address the Borough's immunity.

The court explained that to establish a prima facie case of selective prosecution a plaintiff must establish "(i) others similarly situated generally had not [been] prosecuted for conduct similar to [plaintiff's] and (ii) the [g]overnment's discriminatory selection was based on impermissible ground[s] such as race, religion, or exercise of First Amendment rights." Wayte v. United States, 470 U.S. 598, 605 (1985). Judge Perez Friscia noted that she viewed the facts in the light most favorable plaintiff as required by Brill and determined there were "no genuine issues of material fact remaining for a jury to decide." The court found:

> Plaintiff was notified of the zoning violations on his property, after the Borough received a neighbor's complaint setting forth multiple issues, on March 20, 2015, roughly twenty-one months prior to the summonses being issued in December 2016 and January 2017. Throughout that time, defendants granted plaintiff many extensions to comply with alleged zoning violations. Further, plaintiff stated in numerous letters to Borough officials he was attempting to comply with the zoning requirements by

14

cleaning the debris on his property and was willing to eventually remove the sheds altogether. Plaintiff's letters clearly acknowledge the magnitude of the sheds, canopies and items which needed addressing. Relevantly, plaintiff does not provide any documentation of the 2012 enforcement wherein Borough officials conclude plaintiff's sheds were preexisting non-conforming uses nor does plaintiff address or dispute the alleged aerial photographs demonstrating the sheds were built after the ordinance was enacted. Additionally, plaintiff [did] not provide sufficient evidence [that] the Borough ordinance was only enforced against him and his property and not against other properties with similar structures located on them.

In addition, Judge Perez Friscia denied plaintiff's claim that defendants constitutionally retaliated against him based on his civic participation after applying the three-part test stated in Eichenlaub v. Township of Indiana, 385 F.3d 274, 282 (3d Cir. 2004). Specifically, Judge Perez Friscia explained that "[p]laintiff must prove (1) that he engaged in constitutionally protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." In support of her decision, the judge concluded that Mammone's purported statement that plaintiff would "have more time . . . to fix the issues . . . so you won't have to go to the meetings" was "insufficient to substantiate plaintiff's claims."

A-3698-19

Judge Perez Friscia further explained that "plaintiff provide[d] no evidence to establish that . . . Forbes and Mayor Dillon had any actual discussions or meetings regarding plaintiff's zoning enforcement actions and that such enforcement was directly related to interfering [with] plaintiff's right to speak at public hearings." On this point, the court emphasized that both Forbes and Mayor Dillon "testified they did not speak to one another regarding" the zoning actions.

The judge further addressed whether Mayor Dillon and Forbes were entitled to qualified immunity. Judge Perez Friscia, citing Brown, 230 N.J. at 89, stated that "[t]o determine whether qualified immunity applies, two inquiries are pertinent: (1) were plaintiff's constitutional rights violated; and (2) 'was the constitutional right being violated clearly established at the time so that any reasonable officer acting competently in the circumstances would have known of the constitutional violations.'" The judge concluded that both Mayor Dillon and Forbes were entitled to qualified immunity because "no facts ha[d] been presented to suggest defendants undertook an investigation of plaintiff's property specifically to interfere with his constitutional rights as a proper complaint was initiated prior to any such investigation."

Finally, the court determined that it was not necessary to address the Borough's immunity. Relying upon N.J.S.A. 59:2-10[2] and Monell v. Department of Social Services of City of New York, 436 U.S. 658, 691 (1978), the court concluded that there was "no evidence presented [that] . . . Forbes or Mayor Dillon acted in such a manner as to specifically interfere with plaintiff's constitutional rights."

This appeal followed in which plaintiff raises five primary arguments. He contends the court: 1) applied an incorrect legal standard to his First Amendment retaliation claims, 2) erred in finding that plaintiff had not established a prima facie case of selective prosecution, 3) failed to correctly apply the Brill standard when there remained genuine issues of material fact, 4) committed error in concluding Mayor Dillon and Forbes were entitled to qualified immunity, and 5) improperly declined to address the Borough's liability. We disagree with all of these arguments and affirm substantially for the reasons expressed by Judge Perez Friscia in her thoughtful and comprehensive twenty-five-page written opinion that accompanied the April 24, 2020 order.

---

[2] N.J.S.A. 59:2-10 provides "[a] public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."

## II.

In his first point, plaintiff argues the judge applied the incorrect standard in evaluating his First Amendment retaliation claim, and that his claim should have been analyzed under the three-part test delineated in Eichenlaub, 385 F.3d at 282. Plaintiff also asserts that he satisfied the Eichenlaub test and established a prima facie case of First Amendment retaliation.

The NJCRA is modeled on 42 U.S.C. § 1983. Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 115 (App. Div. 2011). It affords a private right of action against persons who act "under color of law" to interfere with "rights, privileges or immunities" secured not only "by the Constitution or laws of this State," but also "by the Constitution or laws of the United States." N.J.S.A. 10:6-2(c).

"Two types of private claims are recognized under this statute: (1) a claim when one is 'deprived of a right,' and (2) a claim when one's rights have been 'interfered with by threats, intimidation, coercion or force.'" Lapolla v. Cnty. of Union, 449 N.J. Super. 288, 306 (App. Div. 2017) (quoting Felicioni v. Admin. Office of Courts, 404 N.J. Super. 382, 400 (App. Div. 2008)).

Participation at public meetings is a substantive right under the First Amendment. See State v. Charzewski, 356 N.J. Super. 151, 155 (App. Div.

2002).  This right, however, is not "unbridled" and is "subject to reasonable time, manner and place limitations."  Id. at 156.

In Eichenlaub, the Third Circuit stated that "constitutional retaliation claims are analyzed under a three-part test."  385 F.3d at 282.  Specifically, plaintiff "must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."  Ibid.  "The threshold requirement is that the plaintiff identify the protected activity that allegedly spurred the retaliation." Ibid.

Plaintiff maintains that the court incorrectly applied the standard for selective prosecution outlined in Wayte, 470 U.S. 598, to his First Amendment retaliation claim.  Plaintiff ignores the fact that the court separately evaluated his First Amendment retaliation claim under Eichenlaub, the same standard he asserts should have been applied.  Indeed, Judge Perez Friscia conducted a thorough analysis of the referenced claim under the Eichenlaub three-part test.

Plaintiff further argues that he has established a prima facie case of First Amendment retaliation under Eichenlaub.  In this regard, he maintains that his participation at public meetings is a substantive right under the First Amendment and that defendants issued the municipal summonses in retaliation for comments

he made at public meetings. He asserts that he "has provided evidence that the Borough of Ramsey undertook efforts to prosecute him for alleged canopy violations in 2015 through 2017 . . . as a direct response to [his] constitutionally protected activities." Again, we disagree.

There is no dispute that plaintiff's participation at public meetings is a substantive right protected under the First Amendment. See Charzewski, 356 N.J. Super. at 155. Nevertheless, plaintiff's theory that defendants retaliated against him for his comments by attempting to enforce its zoning regulations, thereby satisfying prongs two and three under Eichenlaub, are not supported by the record.

First, plaintiff claims that the 2015 investigation into his canopies was retaliatory because the issue was resolved in 2012 when they were determined to be "preexisting non-conforming structures." In support of his position, plaintiff points to his own testimony that the canopies were "grandfathered" and the December 6, 2012 letter from Mammone summarizing plaintiff's progress in remediating the violations which does not reference the canopies.

Here, plaintiff correctly notes that the December 6, 2012 letter makes no reference to the canopies. However, in Mammone's April 7, 2015 letter, he notes that Scandariato "had no recollection of advising that the sheds . . . were

grandfathered." Plaintiff points to no other support for his self-serving statement, or any formal municipal action, suggesting any of his municipal violations, which included more than the alleged illegal canopies, were permitted uses at the time of the 2012 or 2015 letters.

Plaintiff also asserts that the 2015 investigation was instituted in retaliation of his comments made to Mammone about his "action or inaction" regarding his complaints about his neighbor's property violations. The record, however, establishes that the 2015 investigation began after a neighbor emailed Mammone on March 5, 2015, about potential property violations. Indeed, this email notes that the neighbor was "concerned that [plaintiff] has several structures that [l]ook as if they were meant to be temporary but have become permanent and [are] in disrepair." We are satisfied that the record fails to create a genuine and material question of fact that Mammone acted inconsistently or in a retaliatory manner.

Plaintiff further contends that Mammone's "veiled threat" to stop attending public meetings is evidence of defendants' retaliatory intent. As noted, plaintiff testified that Mammone stated "[w]ell now you'll have more time not to go – to fix the issues we have with these violations, so you won't have to go to the meetings, and you can spend your time repairing or mitigating these

 A-3698-19

issues." First, we note that despite nearly two years of discovery, plaintiff never deposed Mammone to explore this comment. In any event, that comment, assuming it was made, cannot be reasonably interpreted to imply a threat, as it is simply a statement indicating that plaintiff was required to remediate the property violations. Further, plaintiff's admission that he "didn't really put any thought to [the comment]" supports the conclusion that he did not feel threatened by Mammone's alleged statement.

We also note plaintiff never connects the alleged physical assault by Scandariato to his constitutional retaliation claim. Further, the factual record does not support an inference that Scandariato's action was part of a concerted effort by defendants to retaliate against plaintiff in an effort to chill his speech or prevent his attendance at future meetings. By the time of Scandariato's confrontation with plaintiff, the 2014 investigation had already commenced, and plaintiff thereafter attended numerous municipal hearings and meetings.

In addition, plaintiff claims that the 2016 investigation into the property violations by Forbes only occurred because he resumed attending meetings and received push back from Vozeh, Mayor Dillon, and Scandariato. Again, contrary to plaintiff's contention, there is no genuine nor material dispute of fact, to dispute that Forbes opened the 2016 investigation after he received a

complaint regarding canopies on plaintiff's property. Plaintiff's own correspondence confirms his efforts to remediate the conditions on the property that, in part, formed the bases for the complaints.

Finally, there is no support in the record for plaintiff's contention that Mayor Dillon and Forbes conspired to issue the municipal summonses in retaliation for plaintiff's comments made at public meetings. For example, Forbes specifically testified that he did not "have any involvement with the mayor in [an] official capacity" nor did he "have any communications with the office of the mayor" throughout the 2016 investigation. Similarly, Mayor Dillon testified that she did not "have any involvement in [the] decision to investigate the complaints regarding [plaintiff's] property" nor did she have any "communication with anyone in the zoning department regarding the investigation of [plaintiff]."

In sum, plaintiff failed to present evidence that would raise a genuine issue of material fact as to whether defendants "responded with retaliation" or that the "protected activity caused the retaliation." Eichenlaub, 385 F.3d at 282. Accordingly, the court did not err in finding that plaintiff failed to establish a prima facie case of First Amendment retaliation under Eichenlaub.

A-3698-19

III.

Plaintiff also contends that the court erred in concluding that he had not established a prima facie case for selective prosecution. Specifically, plaintiff asserts that he has satisfied the two-part test delineated in Wayte, 470 U.S. at 608, because the summonses were only issued against plaintiff, not his spouse, and defendants' motivation to prosecute the zoning violations resulted from his exercise of First Amendment rights at public comment sessions. We are not persuaded.

"Discriminatory enforcement of an otherwise impartial law by state and local officials is unconstitutional." State, Twp. of Pennsauken v. Schad, 160 N.J. 156, 183 (1999). However, "[t]he conscious exercise of some selectivity in enforcement is not a constitutional violation unless the decision to prosecute is based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Ibid.

A party asserting selective enforcement has a "heavy" burden of proof. State v. Di Frisco, 118 N.J. 253, 266 (1990). As our Supreme Court has held:

> In order to prevail on a claim of discriminatory enforcement, the defendant must plead and prove intentional selectivity as well as an unjustifiable basis for the discrimination. "[The] standards require [the defendant] to show both that the . . . enforcement

24

system had a discriminatory effect and that it was motivated by a discriminatory purpose."

[Ibid. (first alteration in original) (quoting Wayte, 470 U.S. at 608).]

"Stated differently, in order to prevail on a selective prosecution claim, a defendant must prove that the 'prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose,'" and that "'similarly situated individuals . . . were treated differently.'" State v. Ballard, 331 N.J. Super. 529, 540 (App. Div. 2000) (quoting Washington v. Davis, 426 U.S. 229, 241 (1976)) (internal quotation marks omitted). Further, "[o]nce a prima facie showing of a discriminatory prosecution has been made, however, 'the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.'" Ibid. (quoting Washington, 426 U.S. at 241) (internal quotation marks omitted).

Here, there is no evidence that defendants' decision to enforce its zoning code was motivated by "race, religion, or other arbitrary classification." Pennsauken, 160 N.J. at 183. For example, Forbes testified that the basis for the 2016 investigation stemmed from a complaint made by another Borough citizen. Moreover, the record indicates that defendants had a legitimate reason for

25

enforcing its zoning regulations in 2015 and 2016. Specifically, defendants obtained aerial photographs indicating that plaintiff's canopies were constructed after the Borough enacted the applicable ordinance, which regulated the permissible number of accessory buildings. Moreover, Scandariato provided an explanation stating that "[t]he subject sheds are accessory buildings which are defined in Section 34-3 and regulated by Section 34-4.5 of Chapter 34 of the Borough Code."

IV.

In plaintiff's third point, he contends Judge Perez Friscia erred by misapplying the standard for summary judgment under Brill. Specifically, plaintiff asserts that the court "misapprehend[ed], [gave] undue weight, and/or fail[ed] to give due weight to certain key material facts." Plaintiff also maintains that the court did not view the evidence "in light most favorable to the non-moving party." We disagree.

We review the disposition of a summary judgment motion de novo, applying the same standard used by the motion judge. Townsend v. Pierre, 221 N.J. 36, 59 (2015). Like the motion judge, we view "the competent evidential materials presented . . . in the light most favorable to the non-moving party, [and determine whether they] are sufficient to permit a rational factfinder to resolve

26

the alleged disputed issue in favor of the non-moving party." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill, 142 N.J. at 540); see also R. 4:46-2(c). If "the evidence 'is so one-sided that one party must prevail as a matter of law,'" courts will "not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

While a court must view the evidence in the light most favorable to the non-movant, "[c]ompetent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009)). A motion for summary judgment will not be defeated by bare conclusions lacking factual support, Petersen v. Twp. of Raritan, 418 N.J. Super. 125, 132 (App. Div. 2011), self-serving statements, Heyert v. Taddese, 431 N.J. Super. 388, 414 (App. Div. 2013), or disputed facts "of an insubstantial nature." Pressler & Verniero, Current N.J. Court Rules, cmt 2.2 on R. 4:46-2 (2022).

Plaintiff first claims that the court failed to give due weight to the fact that the "summonses and correspondence were issued only against [plaintiff] as opposed to Ms. Braggin." Here, the court acknowledged plaintiff's selective enforcement argument and his position that "the summonses were issued only

against him for the property violations, and not his wife [as a] co-property owner." The court then reviewed the evidence in the record and concluded that "plaintiff [did] not provide sufficient evidence [that] the Borough ordinance was only enforced against him and his property and not against other properties with similar structures located on them." Accordingly, the court considered the fact that the summonses were only issued against plaintiff and concluded that it was not sufficient to establish a prima facie claim of selective enforcement. We discern no error in that conclusion.

Plaintiff also contends that the court "misapprehend[ed] material facts" when it stated that "[p]laintiff's letters clearly acknowledge the magnitude of the sheds, canopies, and items which needed addressing." The court, however, did not misapprehend this fact, as the correspondence between the parties illustrates the "magnitude" of the "sheds, canopies, and items which needed addressing." Indeed, plaintiff requested permission to acquire an additional trailer, in part, to store the multitude of items that he had placed under the canopies.

Plaintiff further claims that the court "erred in finding that plaintiff . . . did not dispute the alleged aerial photographs of sheds being built after the ordinance was enacted" because he did dispute the photographs in his responses to defendants' asserted material facts. Plaintiff's claim, however, misconstrues

28

the motion record. Specifically, defendants' statement of undisputed material facts notes that:

> On May 13, 2015, Mr. Mammone sent [p]laintiff a letter denying a ninety (90) day extension because he needed to inspect the [p]roperty. Additionally, Mr. Mammone reiterated, as he had previously discussed this with [p]laintiff, after the complaint by [p]laintiff's neighbor, Mr. Mammone was provided aerial photographs form 2002 that showed the sheds were erected after 2002 and thus were in violation of the maximum number of sheds permitted by Borough code.

In plaintiff's response to defendants' asserted material facts he stated:

> Admit letter was sent but denied as to remainder as judicial determination renders all of Mr. Mammone's conclusions erroneous in light of its dismissal with prejudice of all charges against [p]laintiff.

It is clear from plaintiff's response that he did not dispute the accuracy of the aerial photographs. Rather, plaintiff stated that he denied there were any zoning violations based upon the September 7, 2017, dismissal of the municipal summonses.

Plaintiff's argument that the court improperly evaluated the motion record contrary to Brill also lacks merit. Essentially, plaintiff reiterates his argument that the record supports his prima facie claim for First Amendment retaliation. As discussed above, however, after conducting a de novo review, we are satisfied that the record failed to raise a genuine dispute of material fact

29

regarding plaintiff's claims, and the court did not err in concluding plaintiff failed to satisfy the Eichenlaub factors.

Indeed, as Judge Perez Friscia noted, the record establishes that the 2015 and 2016 investigations began after neighbors made complaints about plaintiff's property. Further, both Mayor Dillon and Forbes testified that they had no communication about the commencement, or furtherance, of the 2015 or 2016 investigation, and the record fails to contain competent evidence to dispute that fact or create any reasonable inferences that either Mayor Dillon or Forbes discussed the issues with plaintiff's property.

We also disagree with plaintiff's claims that the court made improper credibility determinations by accepting the deposition testimony of Mayor Dillon and Forbes as true. Specifically, plaintiff argues that because the court did not "consider[] . . . the fact that the testimony of both defendants . . . could be dishonest given the obvious motive to conceal any wrongdoing" the court erred in granting summary judgment.

Plaintiff's argument misinterprets the standard for summary judgment. Here, the court was required to review the testimony submitted "in the light most favorable to the non-moving party," which it did. The court was not required to accept unsupported conspiracy theories unmoored to the facts or consider a

witness' sworn testimony untruthful simply because that witness represented an adverse party.   As such, we find no error in the court's conclusion that there remained "no genuine issues of material fact . . . for a jury to decide."

V.

In his fourth point, plaintiff contends Judge Perez Friscia committed error when she concluded Mayor Dillon and Forbes were entitled to qualified immunity.  Relying on <u>Brown</u>, 230 N.J. at 98, plaintiff again argues the motion record contained disputed issues of material fact, and the issue should have been submitted to a jury.  We are not persuaded.

To determine if qualified immunity applies, we consider whether:  (1) plaintiff's constitutional rights violated; and (2) "was the constitutional right being violated clearly established at the time so that any reasonable officer acting competently in the circumstances would have known of the constitutional violation."  <u>Brown</u>, 230 N.J. at 89.  When undertaking this inquiry, the court must view the facts in the light most favorable to the party asserting the injury. <u>Id.</u> at 98.

In <u>Brown</u>, the Court explained qualified immunity as follows:

> The affirmative defense of qualified immunity protects government officials from personal liability for discretionary actions taken in the course of their public responsibilities, insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known. The defense extends to suits brought under . . . the Civil Rights Act, N.J.S.A. 10:6-1 to -2.

This state's qualified immunity doctrine tracks the federal standard, shielding from liability all public officials except those who are plainly incompetent or those who knowingly violate the law.

[Id. at 97-98 (citations omitted).]

Here, plaintiff has failed to show that Mayor Dillon or Forbes violated his First Amendment rights. Indeed, as discussed, plaintiff failed to establish either a claim for First Amendment retaliation or selective enforcement of the Borough's municipal code. Moreover, plaintiff has failed to raise a genuine issue of material fact as to both these claims, and therefore, this was not a case that needed to be "submitted to the jury to determine 'the who-what-when-where-why type of historical fact issues.'" Id. at 98-99 (quoting Schneider v. Simonini, 63 N.J. 336, 359 (2000).

VI.

In his final point, plaintiff contends the court erred by declining to address the issue of the Borough's liability. Specifically, plaintiff claims that the record contains evidence that Forbes and Mayor Dillon "acted in such a manner as to interfere with [plaintiff's] constitutional rights." Further, plaintiff argues that

32

the Borough may be liable because "there is evidence of an individual with policy making authority who committed a tort."  Again, we disagree.

A governmental unit "may not be sued under [Section] 1983 [and by extension, the NJCRA] for an injury inflicted solely by its employees or agents." Monell, 436 U.S. at 694.  It cannot be held liable for the actions of its employees solely based on the doctrine of respondeat superior.  Id. at 691-95.  Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section] 1983 [and by extension, the NJCRA]."  Id. at 694; see also Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 565 (2010) (stating that a municipality can "be held liable for acts committed by one of its employees . . . pursuant to a governmental policy or custom . . . that violate[s] the Constitution").

A plaintiff may establish the existence of a policy or custom by presenting proof that the municipality:  (1) adopted an official policy that deprived citizens of their constitutional rights; (2) tolerated or adopted an unofficial custom that deprived citizens of their constitutional rights; or (3) failed to affirmatively act to train or supervise its employees so as to prevent them from unlawfully

33

depriving citizens of their constitutional rights, although the need to do so was obvious. See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003). A municipality also may be liable for a single decision of an official who "possesses final authority to establish municipal policy with respect to the action ordered." Stomel v. City of Camden, 192 N.J. 137, 146 (2007) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).

As noted, the record does not support plaintiff's claims for First Amendment retaliation or selective prosecution of the Borough's zoning regulations and plaintiff failed to establish that the Borough had a policy or custom which deprived him of his constitutional rights. Natale, 318 F.3d at 584. Similarly, the record does not support plaintiff's argument that an individual with policy making authority, i.e., Mayor Dillon, committed any tort. Stomel, 192 N.J. at 146.

To the extent we have not addressed any of plaintiffs' remaining arguments, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3698-19